# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Philip G. Reinhard | Sitting Judge if Other than Assigned Judge | P. Michael Mahoney |
|---|---|---|---|
| **CASE NUMBER** | 04 C 50206 | **DATE** | 3/14/2005 |
| **CASE TITLE** | Cote vs. Barnhart | | |

**DOCKET ENTRY TEXT:**

For the reasons stated on the attached Memorandum Opinion and Order, the ALJ's decision to deny benefits to Plaintiff is sustained. The ALJ is affirmed at all steps of the disability determination process as outlined above. Defendant's Motion for Summary Judgment is granted. Plaintiff's Motion for Summary Judgment on the administrative record and pleadings is denied.

■ [ For further detail see attached order.]

Notices mailed by judge's staff.

| | Courtroom Deputy Initials: | AM |
|---|---|---|

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| MICHAEL W. COTE, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 04 C 50206 |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | P. Michael Mahoney |
| JOANNE B. BARNHART, | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Michael Cote ("Plaintiff") seeks judicial review of the final decision of the

Commissioner of the Social Security Administration ("Commissioner"). *See* 42 U.S.C. §§

405(g), 1383(c)(3). The Commissioner's final decision denied Plaintiff's application for

Disability Insurance Benefits ("DIB") pursuant to Title II of the Social Security Act, 42 U.S.C.

§ 416, 423, and his application for Supplemental Security Income ("SSI"), pursuant to Title XVI

of the Social Security Act (the "Act"), 42 U.S.C. § 1381(a). This matter is before the Magistrate

Judge pursuant to consents filed by both parties on August 2, 2004. *See* 28 U.S.C. § 636(c); Fed.

R. Civ. P. 73.

## I.    BACKGROUND

Plaintiff filed for DIB and SSI on June 14, 1999 (Tr. 53), and his application for benefits

was denied on December 21, 1999. (Tr. 25). Plaintiff filed a request for reconsideration on

January 18, 2000 (Tr. 29), and was subsequently denied reconsideration on May 24, 2000. (Tr.

30). Plaintiff filed a request for a hearing before an Administrative Law Judge ("ALJ") on May

31, 2000. (Tr. 33). Plaintiff was granted a hearing before ALJ Edward B. Pappert on August 8, 2000. (Tr. 41). Plaintiff appeared, with counsel, before the ALJ on August 24, 2000. (Tr. 21). In a decision dated September 28, 2001, the ALJ found that Plaintiff was not entitled to SSI or DIB. (Tr. 18-24). The Appeals Council denied Plaintiff's request for review on March 4, 2004, making this case ripe for review. (Tr. 6).

## II.    FACTS

Plaintiff was born on October 24, 1961, making him thirty-nine years of age at the time of his August 24, 2001, hearing before the ALJ. (Tr. 73). Plaintiff completed high school and one year of college. (Tr. 70). At the time of his hearing, Plaintiff lived alone in an apartment. (Tr. 108, 332). Plaintiff claims disability since April 2, 1998, due to leg injuries arising from an automobile accident, and also severe depression. (Tr. 64).

Plaintiff had no reported income after December 20, 1998. (Tr. 64). Plaintiff worked as a maintenance mechanic from January, 1998, to December, 1998. (Tr. 81). Plaintiff worked full-time, doing maintenance and repair in an industrial setting. (Tr. 82). His position required standing two hours a day, walking three hours a day, sitting and climbing/stooping one hour each a day, and kneeling, crouching, crawling, and handling small and large objects for thirty minutes a day. (*Id.*). Plaintiff lifted one hundred pounds or more, and frequently lifted fifty pounds or more. (*Id.*). Plaintiff was paid eleven dollars an hour for his services. (*Id.*).

Plaintiff worked as a maintenance mechanic for the Salvation Army from June, 1996, to January, 1998. (Tr. 81). Plaintiff repaired equipment eight hours a day, five days a week, at a rate of seven dollars per hour. (Tr. 83). This position required standing two hours a day, walking three hours a day, sitting and climbing one hour each a day, and stooping, kneeling,

2

crouching , crawling, and handling small and large objects for thirty minutes a day. (*Id.*).

Plaintiff lifted one hundred pounds or more, and frequently lifted fifty pounds or more. (*Id.*).

(*Id.*). Plaintiff supervised up to five people while working for the Salvation Army. (*Id.*).

Plaintiff also worked as a roofer and hot tar supervisor from June, 1994, to June, 1996, and from January, 1985, to January 1992. (Tr. 81). Plaintiff worked full-time and was paid twelve dollars per hour for his services. (Tr. 84). This position required standing two hours a day, walking three hours a day, sitting and climbing/stooping one hour each a day, and kneeling, crouching, crawling, and handling small and large objects for thirty minutes a day. (*Id.*). Plaintiff lifted one hundred pounds or more, and frequently lifted fifty pounds or more. (*Id.*). (*Id.*). Plaintiff supervised up to ten people while working as a roofer. (*Id.*).

Plaintiff worked as a head cook for the Salvation Army in between roofing jobs from June, 1993, to June, 1994. (Tr. 81). At this job, Plaintiff was required to stand two hours a day, walk three hours a day, sit one hour a day, and stoop, kneel, crouch, and handle small and large objects for twenty to thirty minutes each a day. (Tr. 85). Plaintiff lifted one hundred pounds or more, and frequently lifted ten pounds or more. (*Id.*). Plaintiff supervised eight people while working for the Salvation Army as a cook and was paid six dollars per hour for his services. (*Id.*).

Plaintiff re-shingled houses from January, 1992, to June, 1993. (Tr. 81). Plaintiff worked full-time and was paid ten dollars per hour for his services. (Tr. 86). At this job, Plaintiff was required to crawl six hours a day, stand/sit thirty minutes a day, walk/kneel one hour a day, stoop/crouch twenty minutes a day, and handle large objects for one hour a day. (*Id.*). Plaintiff lifted one hundred pounds or more, and frequently lifted fifty pounds or more. (*Id.*).

3

Plaintiff described his typical day since leaving work as beginning at 5:30 a.m., when he gets up for breakfast and occasionally spends time with his landlady. (Tr. 337). Sometimes, Plaintiff watches television, reads books, or rides his bike. (*Id.*). Plaintiff stated that he liked to ride his bike to the library and read magazines. (Tr. 338). Plaintiff stated that he ate some of his meals at a Rescue Mission. (*Id.*). Plaintiff also stated in his disability benefits application that normal activities for him included going to church and mental health classes. (Tr. 91). Finally, Plaintiff reported doing volunteer oil changes and odd jobs for the Salvation Army, but noted that he rarely drives, goes out for dinner or movies, or socializes with neighbors or friends. (Tr. 91, 332). Plaintiff stated he was too depressed for hobbies. (*Id.*).

Plaintiff discussed his April 2, 1998, automobile accident at his hearing. (Tr. 333). Plaintiff stated he lost part of his right leg when a drunk driver hit him while he was riding his bicycle. (*Id.*). Plaintiff also stated that the loss of use of his leg led to severe depression and suicidal tendencies. (*Id.*). Plaintiff stated that since his accident, he has post-traumatic dreams. (Tr. 340). Plaintiff worked as a mechanic at the time of his accident, and he continued to work until December 20, 1998, but was confined to a wheel chair and worked in a limited capacity.[1] (Tr. 334).

Plaintiff testified about his alcohol abuse history, stating that the last time he drank alcohol was December, 1999, when he was admitted to Singer Mental Health Center because he was having suicidal and homicidal thoughts. (Tr. 342). Plaintiff admitted to a DUI in 1999.

---

[1]Plaintiff's last employer completed a work activity questionnaire for Plaintiff, stating that Plaintiff contributed significantly to the workplace before his accident, but after his accident Plaintiff was "not able to sustain sufficient continuity in his weekly work patterns to maintain his value as a BTM employee . . . so [Plaintiff] withdrew himself from continued employment." (Tr. 95).

(Tr. 344). Plaintiff also reported that he had been hospitalized prior to his leg injury for treatment of his psychosis, noting that sometimes he would "fly off the handle"and would go to the hospital instead of going to jail. (Tr. 345-46). Plaintiff stated that he had been to jail four times, one time for aggravated battery, twice for possession of weapons, and once for burglary. (Tr. 346-47, 164). Plaintiff testified that he received medical treatment and college classes while in jail. (Tr. 347).

At the time of Plaintiff's hearing, he took three prescription medications, including 150 milligrams of Wellbutrin[2] twice a day, 10 milligrams of Zyprexa[3] once a day, and 25 milligrams of Atenolol twice a day for hypertension. (Tr. 52). Plaintiff also stated he received treatment therapy through the Janet Wattles Center once a week since 1998. (Tr. 339). Plaintiff testified that he used a cane or brace to get around, and that he could walk fifteen feet at a time, stand ten minutes at a time, but noted he has difficulty sitting in one position for any amount of time. (Tr. 352, 345). Plaintiff stated he could lift 150 pounds from a sitting position and 40 pounds from a standing position. (Tr. 353).

Vocational Expert ("VE"), Mr. Ronald Gehrig, testifying before the ALJ, stated that Plaintiff's past work as a mechanic was semi-skilled, heavy work, and Plaintiff's past work as a roofer was classified as semi-skilled, medium to extremely heavy work. (Tr. 355). The VE testified that Plaintiff's welding skills could be transferred to jobs with lesser exertional levels. (*Id.*). The ALJ then asked the VE whether a hypothetical male, with the following characteristics, could perform Plaintiff's past work:

> age 38. The past relevant work and education experience

---

[2]Indicated for treatment of depression. PHYSICIAN'S DESK REFERENCE (59th Ed. 1655).

[3]Indicated for the treatment of schizophrenia. PHYSICIAN'S DESK REFERENCE (59th Ed. 1900).

equivalent to Mr. Cote. Ability to sit eight hours a day, stand and walk – and/or walk six hours, lift 25 pounds frequently and 50 pounds. In addition to which due to a mental impairment is unable to maintain attention and concentration as to detailed or complex work. Also moderately limited in the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. Moderately limited in the ability to set realistic goals or make plans independently of others. And also moderately limited in the ability to complete normal workday and workweek without interruptions from psychologically based symptoms.

(Tr. 357).

The VE testified that such a hypothetical person could perform Plaintiff's last jobs of maintence mechanic and roofer. (Tr. 357). The ALJ then added a requirement to his hypothetical whereby the worker could stand and walk for only two hours a day, and the ability to kneel, crouch and crawl was limited to only occasionally; climb ladders or scaffolds only infrequently. (Tr. 358). The VE indicated that such a requirement would exclude Plaintiff's past work. (*Id.*). The VE then indicated that such a hypothetical person would be able to work as an order clerk (2,687 Illinois jobs), billing clerk (1,077 jobs), assembler (8,289 jobs), and production inspector (1,797 jobs). (Tr. 360-61). The ALJ declined adding any more restrictions to his hypothetical, pending receipt of additional medical records. (Tr. 361). The VE further noted that were Plaintiff to miss more than one work day a month due to his psychological symptoms, there would be no work available for Plaintiff. (Tr. 362). Plaintiff's attorney inquired about the effect of changing the ALJ's hypothetical from a moderate psychological limitation to a severe limitation, and the VE stated he would reduce the job numbers fifty percent across the board. (*Id.*). Finally, Plaintiff's attorney asked whether adding a requirement that Plaintiff take more breaks than allowed in a normal workday (such as a ten minute break once an hour) would effect the number of jobs available. (Tr. 365-66). The VE replied that such a

6

restriction would eliminate all of the proposed jobs. (*Id*.).

## III.  **MEDICAL HISTORY**

Plaintiff's earliest medical records before this court are treatment records from the Elgin Mental Health Center on May 5, 1989.  However, these records reflect that Plaintiff had been admitted to the Health Center previously in 1988. (Tr. 120).  Plaintiff's admission was spurred by concerns that Plaintiff might hurt himself or others. (*Id*.).  Treatment records indicate that Plaintiff had made suicide attempts while he was intoxicated. (*Id*.).  Plaintiff was discharged and accepted into an in-patient alcohol treatment program on June 6, 1989. (*Id*.).  Plaintiff's discharge summary included a diagnosis of adjustment disorder with disturbance of emotion and conduct, alcohol dependence, and antisocial personality. (Tr. 117).

Plaintiff's records show that he was hit by an automobile on April 2, 1998, while he was riding his bicycle. (Tr. 148-50).  Plaintiff's tibia and fibula were fractured, requiring surgery on April 7, 1998, where Plaintiff underwent open reduction and internal fixation of his fractures. (Tr. 150).  Plaintiff was discharged April 9, 1998, but Plaintiff's wounds twice required debridement, first on April 24, 1998, and again on May 1, 1998. (Tr. 152).  Otherwise, Plaintiff did fine post-operatively, and was discharged May 11, 1998, with his wound healing well. (Tr. 148, 150).

On June 2, 1998, Plaintiff was seen by Dr. Brian Aldred due to leg pain following his surgery. (Tr. 131).  Plaintiff's records indicated that he had been prescribed Vicodin, but this was stopped on May 24, 1998. (*Id*.).  Dr. Aldred gave Plaintiff an injection of Demerol and Vistaril as well as a prescription for twenty Vicodins. (Tr. 230).  On June 11, 1998, Plaintiff reported very little discomfort to Dr. Foskett at his cast clinic examination. (Tr. 134).  X-rays were obtained and showed excellent alignment of his fracture fragments. (*Id*.).

7

Plaintiff was examined by Dr. Wolanyk on July 21, 1998, due to a fall. (Tr. 137). Dr. Wolanyk reported that Plaintiff's ankle was somewhat swollen, but noted no fracture. (*Id.*). Plaintiff was given an air stirrup and directed to elevate and ice his leg. (*Id.*). Plaintiff was given two Vicodin tablets, but requested Demerol for pain. (Tr. 138). Dr. Wolanyk did not believe Plaintiff needed Demerol and noted that Plaintiff was upset that Demerol was not prescribed. (*Id.*).

Plaintiff underwent a follow-up surgery on July 28, 1998, where a distal locking screw from Plaintiff's right tibial IM rod was removed, and a walking cast was applied. (Tr. 141). Prior to Plaintiff's surgery, he was seen by Dr. Foskett for a pre-operative evaluation. (Tr. 302). Dr. Foskett noted that Plaintiff smelled of alcohol, and wrote in his notes that Plaintiff had been drinking a six-pack of beer per day. (*Id.*). Two weeks after Plainitff's surgery, Dr. Foskett stated he would wean Plaintiff from his crutches and return him to work with light duty. (Tr. 303).

Dr. Foskett noted that Plaintiff had excellent bone alignment on October 14, 1998. (Tr. 304). He also noted that Plaintiff intermittently used crutches and could bear his weight fully in his walking cast. (*Id.*). Dr. Foskett opined that Plaintiff's walking cast could be discontinued completely and that Plaintiff would be able to advance his activity in two months. (*Id.*). On December 9, 1998, Plaintiff reported walking out of his cast without significant discomfort, so Dr. Foskett gave Plaintiff an air stirrup for walking long distances. (*Id.*). Plaintiff was returned to work with no work restrictions. (*Id.*).

Plaintiff went to the Janet Wattles Center for a mental health assessment on December 16, 1998. (Tr. 164). Plaintiff's mental status exam revealed that Plaintiff was oriented times

three, had good memory and normal eating and sleeping habits, and did not have hallucinations or hear voices. (Tr. 165). Plaintiff did note that he had suicidal ideations and mood swings. (*Id.*). Plaintiff reported to staff psychiatrist, Dr. Grace Thundiyil, that he had seasonal depression and that he could not get out of bed to work (Tr. 169). He reported being depressed for the past eighteen or nineteen years. (*Id.*). He also said he was drinking alcohol again since his accident, and that he had had a drinking problem since age thirteen or fourteen, but noted he was living at the Salvation Army substance abuse treatment center. (*Id.*).

Plaintiff relayed his history of mental health treatment, noting that his first hospitalization was while he was in jail in 1984. (Tr. 165). Apparently, Plaintiff was admitted for one year to the Menards Psychiatric Ward due to his violent behavior. (*Id.*). In 1985 and 1986, Plaintiff checked himself into Chicago Reed for three months after he was released from jail. (*Id.*). Plaintiff reported a 1989 stay at the Elgin State Hospital as well. (*Id.*). Plaintiff stated he had been involved with AA since 1989, and that he had substance abuse treatment in 1990 and 1991 at Riverside. (Tr. 166). Plaintiff stated he had trouble with cocaine and PCP in the past, but had been clean for a month. (*Id.*). Plaintiff stated his car accident re-triggered his alcohol abuse and drug problems as he began abusing pain killers. (*Id.*). Plaintiff stated he was unemployed due to his depression, but that there was an understanding with his last employer that he would be back to work when he felt better. (Tr. 166-67).

Dr. Thundiyil diagnosed Plaintiff with depressive disorder NOS, personality disorder NOS with antisocial personality traits, but ruled out biploar disorder. (Tr. 170). She prescribed Zoloft and recommended individual counseling. (*Id.*).

Plaintiff was seen on January 28, 1999, at the Rockford Memorial Hospital Emergency Department after Plaintiff threatened to commit suicide by hanging himself. (Tr. 187). Plaintiff

9

was described as having a depressed mood, and Plaintiff reported that he took Zoloft, but rarely. (Tr. 187, 189). Dr. Jonathan Matson reported that Plaintiff had made multiple suicide attempts, including six overdoses, an attempt to hang himself, and had also slit his wrists. (*Id.*). Plaintiff stated that ever since his leg injury, he just wanted to kill himself because he cannot do his engineering job as usual. (*Id.*). Plaintiff's drug screen was negative, but positive for alcohol. (*Id.*). Dr. Matson referred Plaintiff to Dr. Crotts for treatment in the Rockford Memorial Psychiatric ward. (*Id.*). Through February 2, 1999, Plaintiff worked with staff while he went through alcohol withdrawal. (Tr. 199).

On May 21, 1999, Plaintiff was seen by Dr. Thundiyil after being released from jail. (Tr. 171). Records indicate that Plaintiff spent time in jail because Plaintiff became violent with his girlfriend when she tried to take him to the hospital and he was subsequently arrested. (*Id.*). Plaintiff reported that his girlfriend wanted to take him to the hospital because his foot was run over by a forklift while he was at work. (*Id.*). Plaintiff reported that he was prescribed Depakote and Zoloft while in jail. (*Id.*). According to Dr. Thundiyil's notes, Plaintiff made a suicide attempt two to three weeks after his December, 1998, visit to Janet Wattles Center. (*Id.*). During Plaintiff's exam, he revealed that he was depressed and not sleeping well. (*Id.*). He stated he had racing thoughts, but denied suicidal or homicidal ideations. (*Id.*). Dr. Thundiyil described Plaintiff as impulsive, unpredictable, and paranoid during stressful times. (*Id.*). She diagnosed Plaintiff with a Bipolar disorder, mixed type, and prescribed Depakote, Effexor, and Zyprexa. (*Id.*).

At Plaintiff's follow-up with Dr. Thundiyil on May 27, 1999, Plaintiff reported that he was still feeling somewhat depressed, but he denied suicidal or homicidal plans. (Tr. 174). Dr.

10

Thundiyil noted that Plaintiff was doing well on his medications and was learning coping skill in group therapy. (*Id.*). She continued Plaintiff on his medication, but increased his Effexor dosage. (*Id.*). Plaintiff returned to see Dr. Thundiyil on May 28, 1999, after an outburst in group therapy. (Tr. 175). Plaintiff had made some suicidal statements. (*Id.*). Plaintiff reported feeling much better by the time he met with Dr. Thundiyil. (*Id.*).

Plaintiff was admitted to the Singer Mental Health Center from July 15, 1999, to July 20, 1999, and July 23, 1999, to July 29, 1999. (Tr. 209). Plaintiff reported depression and suicidal and homicidal ideations at this time. (*Id.*). Dr. William Wood, Plaintiff's treating physician at Singer, found that Plaintiff's alcohol abuse exacerbated Plaintiff's depression. (*Id.*). Plaintiff was treated with Olanzapine and Citalopram. (*Id.*). Plaintiff was temporarily discharged from Singer. (*Id.*). However, when Plaintiff discovered that his residence had been burglarized while he was at Singer, Plaintiff reported homicidal feelings and returned to Singer because he could not cope. (Tr. 209, 211). The focus of Plaintiff's second stay was decreasing Plaintiff's dependence on Singer for support and to work on Plaintiff's problem solving skills. (Tr. 211). Plaintiff's discharge diagnosis was Polysubstance Induced Mood Disorder with depressive features and onset during intoxication, Intermittent Explosive Disorder, Depressive Disorder NOS, and Antisocial Personality Disorder with narcissistic and borderline personality disorder traits. (Tr. 212). Plaintiff's GAF was 70. (*Id.*).

On September 20, 1999, Plaintiff was seen by Dr. Foskett due to pain where his proximal locking leg screws had become prominent. (Tr. 305-306). Dr. Foskett noted that Plaintiff's fracture was well healed, but also noted a need to remove the locking screws, which was completed on September 24, 1999. (*Id.*).

11

Dr. George Kudirka, a state agency physician, completed a Residual Functional Capacity Assessment ("RFC") on October 12, 1999. (Tr. 226-33). Dr. Kudirka reported that Plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, and stand/walk/sit for a total of six hours each in an eight hour workday with normal breaks. (Tr. 227). Dr. Kudirka noted that Plaintiff was limited in his ability to push or pull in his lower extremities due to posttraumatic knee joint arthritis. (*Id*.). Dr. Kudirka stated Plaintiff should only occasionally kneel and crawl, but noted no other postural, manipulative, visual, or communicative limitations. (Tr. 228-230).

On November 17, 1999, Plaintiff was seen by consulting psychiatrist, Dr. Delsie Gavali. (Tr. 234). Dr. Gavali examined Plaintiff for forty-five minutes and reviewed his medical records. (Tr. 236). Dr. Gavali stated Plaintiff had financial and housing problems, which caused Plaintiff to become suicidal. (Tr. 234). Plaintiff reported that he started drinking at age thirteen and became an alcoholic by twenty-three. (*Id*.). Plaintiff stated he experimented with drugs. (*Id*.). Plaintiff noted he contracted Hepatitis C from a tattoo. (*Id*.). During Plaintiff's exam, he was sad and a little tearful. (*Id*.). He knew the date, current events, five presidents, and five large cities. (Tr. 235). Plaintiff stated he had a racing mind, but no delusions or hallucinations. (*Id*.). Plaintiff reported no sleeping or eating problems and thought he was stable on Wellbutrin, Efexor, and Zyprexa. (*Id*.). Dr. Gavali diagnosed Plaintiff with Cyclothymic Disorder (bipolar disorder consisting of short periods of mild depression and short periods of hypomania), Polysubstance Abuse, Alcohol dependence, and antisocial personality. (*Id*.). His GAF score was 50. (*Id*.). Dr. Gavali further stated she did not believe Plaintiff was very truthful with her based on reviewing his records. (Tr. 236).

A state agency psychologist, Dr. John T. Tomassetti, completed a Mental Residual Functional Capacity Assessment ("MRFC") for Plaintiff on December 8, 1999. (Tr. 261-64). While Dr. Tomassetti found that Plaintiff was not significantly limited in his ability to understand, remember, and carry out instructions, the doctor did find that Plaintiff's sustained concentration for carrying out detailed instructions was moderately limited. (Tr. 261). Plaintiff's ability to get along with co-workers and ability to set realistic goals were also noted as moderately limited, but no marked limitations were recorded. (Tr. 262). A medical consultant, Dr. Carole Rosanova, reviewed Dr. Tomasetti's reports and found them to be reasonable as the etiology of Plaintiff's mental illness was noted to be his substance abuse. (Tr. 274).

Dr. Tomassetti also completed a Psychiatric Review Technique form for Plaintiff on December 18, 1999. (Tr. 265). Dr. Tomassetti opined that Plaintiff had an affective disorder (Cyclothymic Disorder, 12.04), a personality disorder (Anti-social Personality, 12.08), and substance addiction disorders (alcohol dependency, poly-substance abuse, 12.09). (*Id.*). Dr. Tomassetti found no evidence of an organic mental disorder, anxiety related disorder, mental retardation, or schizophrenia. (Tr. 268-69). Dr. Tomassetti found that Plaintiff's alcohol dependency and poly-substance abuse created a slight restriction on his daily living activities, and a moderate restriction on his social functioning, but did not find his restrictions were marked, so as to satisfy a Listing. (Tr. 272). Dr. Tomassetti found that Plaintiff was often limited in his ability to maintain concentration/persistence/pace, but found insufficient evidence for episodes of deterioration or decompensation. (*Id.*).

Plaintiff was hospitalized December 17, 1999, to January 5, 2000, at Singer Mental Health & Developmental Center. (Tr. 239). Plaintiff was hospitalized due to suicidal thoughts. (Tr. 241). Records from Singer contributed Plaintiff's suicidal thoughts to Plaintiff's drinking

13

problem and being off his medications for two weeks. (*Id.*). Apparently, three weeks before

Plaintiff was hospitalized at Singer, Plaintiff was again hit by a car while riding his bike through

an intersection, injuring his left foot and causing a concussion. (Tr. 242). Plaintiff's records

indicated that the first goal for Plaintiff was to maintain an alcohol and drug free state. (*Id.*).

Plaintiff was diagnosed with alcohol dependence, alcohol induced mood disorder with

depressive features, adjustment disorder with depressed mood, depressive disorder NOS,

antisocial personality, and his GAF was 15. (Tr. 243). Plaintiff reportedly did well after he was

placed on a psychopharmacological regimen of olanzapine and citalopram. (*Id.*). A thorough

physical exam was performed. (*Id.*). No treatment was thought necessary for Plaintiff's leg

injuries. (Tr. 244). Plaintiff was in a good mood when seen for a psychiatric discharge

evaluation interview by Dr. William Wood. (*Id.*). Plaintiff acknowledged that his rage reactions

were more frequent and intense with alcohol abuse, but Dr. Wood stated he had "no insight into

the core nature of his psychiatric disorder (i.e. alcohol abuse and alcohol induced mood

disorder)." (Tr. 248, 250). Plaintiff denied all symptoms and signs of anxiety or depression at

clinically significant levels, though he expressed some apprehension about where he would be

living. (Tr. 245). Plaintiff agreed to an absolute discharge after an outpatient residence was

secured through the Janet Wattles Center. (Tr. 244). Plaintiff was to participate in day treatment

and other psych-social rehabilitation with the Janet Wattles Mentally Ill Substance Abuser

("MISA") services. (*Id.*).

On January 14, 2000, Plaintiff made a follow-up visit with Dr. Gavali. (Tr. 289).

Plaintiff wanted to renew prescription medications prescribed by Dr. Thundiyil. (*Id.*). Plaintiff

reported sleeping and eating well, but noted he felt helpless and had some homicidal and suicidal

thoughts. (*Id.*). Dr. Gavali prescribed Zyprexa and Wellbutrin. (*Id.*). She diagnosed bipolar

disorder, antisocial personality, and recorded Plaintiff's GAF as 50. (*Id.*). On January 20, 2000,

Dr. Gavali opined that Plaintiff seemed very angry. (Tr. 290). She continued him on his

medications, but modified her diagnosis to schizo-affective disorder and alcohol abuse. (*Id.*).

Plaintiff was seen by Dr. Thundiyil on May 3, 2000. (Tr. 292). Plaintiff reported feeling

better, and the doctor's records noted he was in compliance with his medications. (*Id.*). Plaintiff

did not have hallucinations or delusions, nor did he have homicidal or suicidal ideations. (Tr.

293). Dr. Thundiyil continued Plaintiff on Zyprexa and Wellbutrin, and recommended Plaintiff

stay with his AA and MISA support groups. (*Id.*).

## IV.   **STANDARD OF REVIEW**

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the

proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). Review by the

court, however, is not *de novo*; the court "may not decide the facts anew, reweigh the evidence

or substitute its own judgment for that of the [ALJ]." *Binion v. Charter,* 108 F.3d 780, 782 (7th

Cir. 1997); *see also Maggard v. Apfel*, 167 F.3d 376, 379 (7th Cir. 1999). The duties to weigh

the evidence, resolve material conflicts, make independent findings of fact, and decide the case

accordingly are entrusted to the commissioner; "[w]here conflicting evidence allows reasonable

minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision

falls on the Commissioner." *Schoenfeld v. Apfel*, 237 F.3d 788, 793 (7th Cir. 2001). If the

Commissioner's decision is supported by substantial evidence, it is conclusive and this court

must affirm. 42 U.S.C. § 405(g); *see also Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002).

"Substantial evidence" is "evidence which a reasonable mind would accept as adequate to

support a conclusion." *Binion*, 108 F.3d at 782.

The Seventh Circuit demands even greater deference to the ALJ's evidentiary determinations. So long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting evidence of disability," the determination must stand on review. *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992). Minimal articulation means that an ALJ must provide an opinion that enables a reviewing court to trace the path of his reasoning. *Clifford v. Apfel*, 227 F.3d 863, 874 (7th Cir. 2000); *Rohan v. Charter*, 98 F.3d 966, 971 (7th Cir. 1996). Where a witness credibility determination is based upon the ALJ's subjective observation of the witness, the determination may only be disturbed if it is "patently wrong" or if it finds no support in the record. *Pope v. Shalata*, 988 F.2d 473, 487 (7th Cir. 1993); *Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989). "However, when such determinations rest on objective factors of fundamental implausibilities rather than subjective considerations, [reviewing] courts have greater freedom to review the ALJ decision." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994); *Yousif v. Chater*, 901 F. Supp. 1377, 1384 (N.D. Ill. 1995).

## V.  **FRAMEWORK FOR DECISION**

The ALJ concluded that Plaintiff did not meet the Act's definition of "disabled," and accordingly denied his application for benefits. "Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382(c)(3)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and

16

laboratory diagnostic techniques." 42 U.S.C. § 1382(c)(3)(C); *see also Clark v. Sullivan*, 891 F.2d 175, 177 (7th Cir. 1988).

The Commissioner proceeds through as many as five steps in determining whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (1998).[4] The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments; (4) whether the claimant is capable of performing work which the claimant performed in the past; and (5) whether the claimant is capable of performing any other work in the national economy.

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520 (a)(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties that are done, or intended to be done, for pay or profit. 20 C.F.R. § 404.1510. If the claimant is engaged in substantial gainful activity, he or she is found not disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

Step Two requires a determination whether the claimant is suffering from a severe impairment.[5] A severe impairment is one which significantly limits the claimant's physical or

---

[4]The Commissioner has promulgated parallel regulations governing disability determinations under Title II and Title XVI. *See* 20 C.F.R. Ch. III, Parts 404, 416. For syntactic simplicity, future references to Part 416 of the regulations will be omitted where they are identical to Part 404.

[5]The claimant need not specify a single disabling impairment, as the Commissioner will consider the combined affect of multiple impairments. *See, e.g.*, 20 C.F.R. § 404.1520(c). For syntactic simplicity, however, this generic discussion of the Commissioner's decision-making process will

17

mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). The claimant's age, education, and work experience are not considered in making a Step Two severity determination. 20 C.F.R. § 404.1520(c). If the claimant suffers from severe impairment, then the inquiry moves on to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends.

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. Ch. III, Part 404, Subpart P, Appendix 1. The listings describe, for each of the major body systems, impairments which are considered severe enough *per se* to prevent a person from doing any significant gainful activity. 20 C.F.R. §§ 404.1525(a). The listings streamline the decision process by identifying certain disabled claimants without need to continue the inquiry. *Bowen v. New York*, 476 U.S. 467 (1986). Accordingly, if the claimant's impairment meets or is medically equivalent to one in the listings, then the claimant is found to be disabled, and the inquiry ends; if not, the inquiry moves on to Step Four.

At Step Four, the Commissioner determines whether the claimant's residual functional capacity allows the claimant to return to past relevant work. Residual functional capacity is a measure of the abilities which the claimant retains despite his or her impairment. 20 C.F.R. § 404.1545(a). Although medical opinions bear strongly upon the determination of residual functional capacity, they are not conclusive; the determination is left to the Commissioner, who must resolve any discrepancies in the evidence and base a decision upon the record as a whole. 20 C.F.R. § 404.1527(e)(2); *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). Past relevant work is work previously performed by the claimant that constituted substantial gainful activity

use the singular "impairment" to include both singular and multiple impairments.

and satisfied certain durational and recency requirements. 20 C.F.R. § 404.1465; Social Security Ruling 82-62. If the claimant's residual functional capacity allows him to return to past relevant work, then he is found not disabled; if he is not so able, the inquiry proceeds to Step Five.

At Step Five, the Commissioner must establish that the claimant's residual functional capacity allows the claimant to engage in work found in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 404.1566. The Commissioner may carry this burden by relying upon vocational expert testimony, or by showing that a claimant's residual functional capacity, age, education, and work experience coincide exactly with a rule in the Medical-Vocational Guidelines (the "grids"). *See* 20 C.F.R. Ch. III, Part 404 Subpart P, Appendix 2; *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987); Social Security Law and Practice, Volume 3, § 43:1. If the ALJ correctly relies on the grids, vocational expert evidence is unnecessary. *Luna v. Shalala,* 22 F.3d 687, 691-92 (7th Cir. 1994). If the Commissioner establishes that sufficient work exists in the national economy that the claimant is qualified and able to perform, then the claimant will be found not disabled; if not, the claimant will be found to be disabled.

## VI.   ANALYSIS

The court will proceed through the five step analysis in order.

## A.   Step One: Is the claimant currently engaged in substantial gainful activity?

In performing the Step One Analysis, the ALJ found that Plaintiff had engaged in work since his alleged onset date, but found the evidence was insufficient to show if the work was substantial gainful activity, so he found that Plaintiff satisfied Step One. (Tr. 15-16). The finding of the ALJ as to Step One of the Analysis is not challenged by either party, and the court

finds no reason to disturb this finding. The ALJ's determination that Plaintiff satisfies Step One of the Analysis is affirmed.

**B.      Step Two:  Does the claimant suffer from a severe impairment?**

In performing the Step Two Analysis, the ALJ found Plaintiff suffered from severe impairments, specifically injuries to his right leg, depression and anti-social personality disorder. (Tr. 16).

This finding is not challenged by either party, and the court finds no reason to disturb it. Substantial evidence exists to support the ALJ's determination that Plaintiff suffers from severe impairments. The ALJ's finding as to Step Two of the Analysis is affirmed.

**C.      Step Three:  Does claimant's impairment meet or medically equal an impairment in the Commissioner's listing of impairments?**

In performing the analysis for Step Three, the ALJ determined that Plaintiff's impairments met or equaled impairments in the Listings (C.F.R. § 404.1520(d); 20 C.F.R. Pt. 404, Subpt. P, App. 1) only because of the combined effect that drugs and alcohol have had on Plaintiff's mental impairments. (Tr. 16). In particular, the ALJ found that Plaintiff met the criteria in Listings 12.04 (affective disorder), 12.08 (personality disorder), and 12.09 (substance abuse disorder) because of the deleterious effects of drugs and alcohol on Plaintiff.

When an ALJ determines that a claimant would not have a severe impairment that significantly limits ability to do basic work activity but for drug and alcohol abuse, the claimant is ineligible for benefits pursuant to Section 105 of Public Law 104-121, enacted March 29, 1996. *See* 42 U.S.C. §423(d)(2)(C). Congress' 1996 amendment of the Social Security Act provides:

(C) An individual shall not be considered to be disabled for purposes of this title [42 USCS §§§§ 401 *et seq.*] if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled.

42 U.S.C. §423(d)(2)(C).

Materiality is to be determined in accordance with 20 C.F.R. § 416.935, which provides that the key factor to consider in determining whether substance addiction is a contributing factor is whether a claimant would still be found disabled if he or she stopped using drugs or alcohol. 20 C.F.R. §416.935(b)(1). However, "only after the ALJ has made an initial determination" that a claimant is disabled, that drug or alcohol abuse is a concern, and "that substantial evidence on the record shows what limitations would remain in the absence of alcoholism or drug addiction, may [the ALJ] then reach a conclusion on whether [a claimant's] substance use disorders are a contributing factor material to the determination of disability." *See Brueggemann v. Barnhart*, 348 F.3d 689, 695 (8th Cir. 2003). While the regulations do provide that the determination as to materiality is reserved to the Commissioner, the ALJ must still demonstrate that his or her findings are supported by substantial evidence. *See* 20 C.F.R §416.927(e)(1) and 42 U.S.C. §405(g) (1991)(made applicable to SSI by 42 U.S.C. §1383(c)(3) (1992)). If an ALJ is unable to determine whether substance addiction is a contributing factor material to the claimant's disability, the claimant's burden is met and an award of benefits must follow. *Brueggemann v. Barnhart*, 348 F.3d 689, 693 (8th Cir. 2003).

There is no dispute that Plaintiff is disabled under the Listings when Plaintiff's symptoms due to substance abuse addiction are considered. The issue is whether the ALJ properly determined that Plaintiff's physical and mental limitations would not be disabling if Plaintiff did not abuse alcohol or drugs. Because the ALJ did make the proper initial determinations that

Plaintiff was disabled and that drug or alcohol abuse was a concern before turning to the evidence in the record to determine what limitations would remain in the absence of alcoholism or drug addiction in Plaintiff's case, the crux of Plaintiff's case is whether the ALJ's finding that substance abuse was a contributing factor material to the determination of Plaintiff's disability is supported by substantial evidence.

The ALJ noted, in support of his finding that Plaintiff's impairments only came within the meaning of the Listings because of the drug and alcohol abuse, that Plaintiff's onset of depression coincided with his abuse of drugs and alcohol and noted that his anti-social personality was fueled by drugs and alcohol. (Tr. 16-17). The ALJ further noted that Plaintiff's suicide attempts mostly occurred while Plaintiff was drunk or high. (*Id*.). Finally, the ALJ stated that Plaintiff's treating psychiatrist, Dr. Wood, diagnosed Plaintiff with alcohol-induced mood disorder with depressive features and onset during intoxication and alcohol induced psychotic disorder. (Tr. 17).

Plaintiff argues that the ALJ should have found that Plaintiff's substance addiction was not material to his impairments because there was insufficient evidence to determine whether Plaintiff's limitations were the result of his addiction disorder or his mental disorders. (Pl.'s Mem., at 4). Plaintiff argues that a medical expert should have been called to help the ALJ make his determination. (*Id*. at 4-5). Defendant maintains that substantial evidence does support the ALJ's finding that Plaintiff's substance abuse was contributing factor material to his disability. (Def.'s Mem., at 9-10). Specifically, Defendant argues Plaintiff's psychiatric treatment records confirm that Plaintiff's mental impairments were not disabling absent his substance abuse. (*Id*. at 12).

The court agrees that substantial evidence exists in the record to show what limitations would remain in the absence of Plaintiff's substance abuse, and that the ALJ properly concluded Plaintiff's substance abuse was a contributing factor material to the determination of disability.

Clearly, even if Plaintiff did not use alcohol or drugs, he would still have some physical limitations due to his leg injuries, but those limitations are not severe enough for Plaintiff to be considered disabled. Plaintiff's April 2, 1998, injury to his right leg was quite severe and required numerous surgical procedures. (Tr. 141, 148, 150). However, Plaintiff did well post-operatively and was returned to work with no work restrictions on December 9, 1998, by his treating doctor, Dr. Foskett. (Tr. 302-04). The state agency physician, Dr. Kurdirka, also noted that Plaintiff could lift ten pounds frequently, twenty pounds occasionally, and stand/walk/sit for six hours each in an eight hour workday with normal breaks. (Tr. 227). While Plaintiff was limited in his pushing/pulling and kneeling/crawling by Dr. Kurdirka, no other postural limitations were recorded. (Tr. 227-30). As noted by the ALJ, Plaintiff recovered well enough to resume work and riding his bicycle. (Tr. 16).

Admittedly, it is more difficult to separate Plaintiff's mental limitations from his limitations due to substance abuse. In this case, though, the court finds that substantial evidence exists to show that Plaintiff's mental disorders are not disabling when he abstains from substance abuse. First, Plaintiff did state that he had a drinking problem since age thirteen or fourteen, and it appears that his onset of depression coincided with this abuse at age fifteen or sixteen. (Tr. 169, 209). Second, Plaintiff's suicide attempts also coincide with his substance abuse. (Tr. 120, 165, 216, 247, 257). For example, Plaintiff's alcohol screen was positive when he threatened to commit suicide January 28, 1999, and then was admitted to the Rockford Memorial psychiatric ward for alcohol withdrawal. (Tr. 187, 189, 199). Third, Consulting Psychiatrist, Dr. Gavali, reported that Plaintiff thought he was stable when he was on his medications. (Tr. 235). Dr. Gavali also diagnosed Plaintiff with Cyclothymic Disorder, polysubstance abuse, alcohol dependence, and antisocial personality. (Tr. 235-36). Fourth, Dr. Tomassetti, a state agency psychologist, also diagnosed Plaintiff with the same disorders as Dr. Gavali. (Tr. 265). The medical consultant reviewing Dr. Tomasetti's report, Dr. Rosanova, found his findings reasonable because the etiology of Plaintiff's mental illness was substance abuse. (Tr. 274).

23

Fifth, Dr. William Wood of Singer Mental Health Center spent time treating Plaintiff July 15, 1999, through July 29, 1999. (Tr. 209). Dr. Wood opined that Plaintiff's alcohol abuse exacerbated his depression, and diagnosed Plaintiff with Polysubstance Induced Mood Disorder with depressive features and onset during intoxication. (Tr. 212). He opined that alcohol and drug abuse were Plaintiff's "most pressing area of concern" because of the "mood dislocations and disinhibitions" flowing from his substance abuse. (Tr. 242). In fact, Plaintiff noted that he felt much better after his two-week drug and alcohol free stay at Singer. (Tr. 244). Finally, Plaintiff's treatment records from Singer from December 17, 1999, to January 5, 2000, also contribute Plaintiff's suicidal thoughts to Plaintiff's drinking and failure to take his medications. (Tr. 241). Plaintiff did much better after being placed on a psychopharmocological regimen. (Tr. 243). Dr. Wood noted that Plaintiff's rage reactions were more frequent and intense with alcohol abuse, and he also opined that Plaintiff has "no insight into the core nature of his psychiatric disorder (i.e. alcohol abuse and alcohol induced mood disorder"). (Tr. 248, 250).

All of this evidence leads the court to its determination that Plaintiff's treating and examining doctors believed Plaintiff's mental problems stemmed from his substance abuse. The court sees no reason to remand Plaintiff's case for additional medical expert testimony given the weight of the record from Plaintiff's treating physicians. Rational minds may disagree as to the outcomes flowing from the record and testimony presented, but the ALJ is given the power to weigh the evidence and make an appropriate decision. *See Farrell v. Sullivan*, 878 F.2d 985, 990 (7th Cir. 1989). This court will uphold such a decision if substantial evidence underpinning it exists. (*Id.*). In this case, the court finds that the ALJ's conclusion that Plaintiff's limitations were not disabling after parsing out substance abuse related factors is supported by the record. Thus, the ALJ's determination as to Step Three of the Analysis is affirmed.

**D.      Step Four: Is the claimant capable of performing work which the claimant performed in the past?**

In performing the analysis for Step Four, the ALJ determined that Plaintiff was not able to perform his past relevant work based on the VE's testimony. (Tr. 17). This finding is not challenged by either party, and the court finds no reason to disturb it. The ALJ's finding as to Step Four of the Analysis is affirmed.

## E. Step Five: Is the claimant capable of performing any work existing in substantial numbers in the national economy?

The ALJ determined at Step Five that Plaintiff could perform a limited range of light, unskilled work. (Tr. 21-22). Before doing so, the ALJ determined Plaintiff's physical and mental residual functional capacity ("RFC" and "MRFC" respectively) at Step Four. The RFC is what the claimant can still do despite his or her physical limitations. 20 C.F.R. §416.945. In determining a MRFC, the ALJ assesses the nature and the extent of the Plaintiff's mental limitations and restrictions. 20 C.F.R. §416.945(c). In order to properly assess an individual's level of functioning due to a mental disorder, evaluation of the impairment must take into account the severity of the impairment over a period of time. 20 C.F.R. Ch III, Part 404, Subpart P, Appendix 1 12.00(d). All of this information is then used to complete Plaintiff's vocational assessment.

After considering the entire record, the ALJ found Plaintiff had the residual functional capacity for:

> simple tasks akin to unskilled work provided he is limited to (1) lifting and carrying twenty-five pounds frequently and fifty pounds occasionally; (2) standing or walking for two hours in an eight-hour workday; (3) occasionally crouching or crawling; and (4) infrequently climbing ladders, or scaffolding. The claimant can sit for eight hours during a normal workday, but has moderate limitations in (1) setting realistic goals or making plans

> independently of others; and (2) getting along with co-workers or peers without distracting them or exhibiting behavioral extremes.

(Tr. 21-22). The ALJ reported that the objective findings in Plaintiff's medical history failed to provide support for his allegations of disabling symptoms and limitations greater than those listed above. (Tr. 20). In support of this statement, the ALJ called into question Plaintiff's credibility. He noted that Plaintiff testified that he last worked in 1998, but Plaintiff continued to tell others that he had been working as late as January, 2000. (Tr. 15). Plaintiff also indicated that he stopped drinking in December, 1999, but Plaintiff's medical records showed otherwise. (*Id.*). The ALJ also pointed out that Plaintiff was able to ride a bike and return to work even though he complained of constant pain in his leg, and that Plaintiff's testimony about constant pain was contradicted by Plaintiff's medical records that state he did not appear to be in pain or that he could sit comfortably. (Tr. 16-18, 20). Finally, the ALJ pointed to Plaintiff's convictions for crimes involving dishonesty. (Tr. 20).

Generally, a court will only reverse an ALJ's credibility determination if it is "patently wrong." *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003). However, in evaluating credibility, the ALJ must follow her own regulations, including SSR 96-7p, which lists relevant considerations for evaluating credibility. *Lopez v. Barnhart*, 336 F.3d 535, 539-40 (7th Cir. 2003). "The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision." *See* SSR 96-7p. Thus, an ALJ's conclusion is afforded great deference so long as the court finds that the ALJ followed proper procedures in making his or her determination. Even so, administrative law opinions are subject to harmless error review,

26

such that every technical violation of the SSR does not equate to an automatic reversal or remand. *See Keys v. Barnhart*, 347 F.3d 990 (7th Cir. 2003).

In this case, the court finds that the ALJ's credibility determination was grounded in the record and adequately justified in his opinion. The ALJ did not randomly decide to discredit Plaintiff's complaints of disabling symptoms. Rather, the ALJ specifically stated that he did not find Plaintiff's subjective complaints entirely credible, and he discussed the reasons for his disbelief.

In addition to the evidence noted by the ALJ that casts doubt on the severity of Plaintiff's alleged impairments, the court notes that other doctors treating Plaintiff called into question his credibility. For example, Dr. Gavali stated she did not believe Plaintiff was truthful, (Tr. 236), and Dr. Wolanyk reported that Plaintiff was exaggerating his pain in order to obtain stronger medications. (Tr. 137-38). Also, not one of Plaintiff's physicians ever indicated that Plaintiff is disabled. In addition, the state agency physician found Plaintiff capable of work (Tr. 226-33), as did the state agency psychologist. (Tr. 261-64). Given the ALJ's supported decision for finding Plaintiff's complaints not entirely credible and Plaintiff's longitudinal medical record, this court finds the ALJ's conclusion that Plaintiff was not entirely credible to be reasonable and sufficiently explained. As such, the court finds no reason to reverse the ALJ's finding, nor to remand for a new credibility determination.

The court also finds that the ALJ's RFC determination is substantially supported by the record. As stated by the ALJ, the proper inquiry given the earlier finding of disability, was to determine which of the Plaintiff's physical and mental limitations would remain if the Plaintiff

stopped using drugs and alcohol, and then to determine whether these remaining limitations would be disabling.

First, the ALJ evaluated Plaintiff's physical limitations, which Plaintiff stated as an inability to sit comfortably, stand for more than ten minutes, or walk farther than fifteen feet, due to constant leg pain. (Tr. 17). The ALJ conceded that Plaintiff limped when he walked due to the removal of much of Plaintiff's gastrocnemius muscle, but he did not find the impairment disabling because Plaintiff's motor functioning was near normal with only minor neurological deficits. (Tr. 18). The ALJ also noted that Plaintiff was able to return to work, do volunteer work, and ride his bicycle after his leg injury. (*Id.*).

The court's own review of the record for substantial evidence supporting the ALJ's physical RFC determination reveals no evidence contradicting the ALJ's decision. In fact, as discussed in Step Three, Plaintiff's treating physician returned Plaintiff to work with no work restrictions and the state agency physician placed no restrictions on Plaintiff that would preclude him from doing light unskilled work. Thus, the ALJ's physical RFC is affirmed.

When the ALJ evaluated Plaintiff's MRFC, he found that Plaintiff's mental impairments were not disabling absent drug and alcohol use. Though Plaintiff stated his depression was debilitating, the ALJ noted that Plaintiff's condition improved substantially when Plaintiff was sober and properly medicated. (Tr. 18). In support of this statement, the ALJ pointed to evidence in the record that showed Plaintiff to be alert, oriented in all spheres, logical, cognitively normal, and very knowledgeable when sober. (Tr. 18-19). The ALJ also noted that Plaintiff's anti-social personality disorder had only a mild effect on Plaintiff's day to day

activities because Plaintiff took part in household tasks, volunteer work, and performing odd jobs. (Tr. 19). Additionally, the ALJ found that Plaintiff's temper was a product of Plaintiff's intoxication, and only a moderate limitation on his social functioning otherwise. (*Id.*). The ALJ stated that Plaintiff's ability to make friends, work with disabled children, attend church and AA, and to get along with his landlady supports his decision. (*Id.*). As for Plaintiff's concentration, persistence, and pace, the ALJ found that Plaintiff would have no difficulty completing simple tasks common to unskilled work because of Plaintiff's ability to change oil in automobiles, manage his finances, and to participate in leisure activities like reading, watching television, and riding a bicycle. (*Id.*).

While Plaintiff maintains that there was no clear medical evidence addressing whether his mental condition improves when he abstains from substance abuse, the court finds that the medical record is sufficient to support the ALJ's MRFC. Dr. Wood's analysis and diagnosis is most telling. After two intensive rounds of treatment with Plaintiff in the Summer and Winter of 1999, Dr. Wood opined that Plaintiff has "no insight into the *core nature of his psychiatric disorder (i.e. alcohol abuse and alcohol induced mood disorder)*." (Tr. 250)(emphasis added). As detailed in Step Three above, Plaintiff consistently felt better when medicated and drug free. Each of Plaintiff's doctors emphasized substance abuse in both their diagnoses and treatment plans. While Plaintiff is correct that no doctor specifically stated Plaintiff's mental impairments would not exist if he abstained from substance abuse, the weight of the record supports the conclusion that there would be a vast improvement. Thus, substantial evidence in the record supports the ALJ's selection of limitations, so the ALJ's MRFC is also affirmed.

Finally, the ALJ's application of the rules and regulations to determine if Plaintiff's ability to perform jobs that exist in significant numbers in the national economy at Step Five is not challenged. The ALJ correctly found, according to the evidence presented by the VE, that Plaintiff could perform the jobs of assembler (8,289 jobs), inspector (1,797 jobs), and billing clerk (1,077 jobs). (*Id.*).

Accordingly, in this case, the court finds that substantial evidence supports the ALJ's Step Five decision, and therefore, the ALJ's determination as to Step Five of the Analysis is affirmed.

## VII.  CONCLUSION

For the foregoing reasons, the ALJ's decision to deny benefits to Plaintiff is sustained. The ALJ is affirmed at all steps of the disability determination process as outlined above. Defendant's Motion for Summary Judgment is granted. Plaintiff's Motion for Summary Judgment on the administrative record and pleadings is denied.

ENTER:

**P. MICHAEL MAHONEY, MAGISTRATE JUDGE**
**UNITED STATES DISTRICT COURT**

DATE: 3/14/05